UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

Seth Ritchie,
          Plaintiff,



COMPLAINT

INDEX#

42 U.S.C. §1983
28 U.S.C. §1331

JURY TRIAL REQUESTED

     -against-

DEFENDANTS SUED IN
OFFICIAL AND
INDIVIDUAL CAPACITY

Glenda Bubb, P.O. Capers, R. Smith,
P.O. Sutherland, Denise Granum,
Charles Feliciano, Mr. Peshkin,
Chandra Perry-Patterson, Andrea Evans,
Linda Gabriele, John Lowery and
Milton Brown,
          Defendants
--------------------------------------------------------X

Seth Ritchie, declares under penalty of perjury that the following is true and correct:

PARTIES: Plaintiff- Seth Ritchie resides at 138 Grove Street in the County of Brooklyn,
City of New York 11221.

PARTIES- Defendants:

1. Parole Officer Glenda Bubb- 333 Schermerhorn Street Brooklyn New York
   11217

2. Parole Officer Capers- 333 Schermerhorn Street Brooklyn New York 11217 .

3. R. Smith-Supervising Parole Officer- 333 Schermerhorn Street , Brooklyn , N.Y.
11217 .

4.Parole Officer Sutherland- (3rd Party Defendant) 333 Schermerhorn Street Brooklyn
New York 11217

5.   Supervising Parole Officer Denise Granum-333 Schermerhorn Street Brooklyn
   New York 11217

6. Charles Feliciano-Bureau Chief- NYS Division Of Parole -333 Schermerhorn Street Brooklyn New York 11217

7. Mr. Peshkin- Parole Revocation Specialist-333 Schermerhorn Street Brooklyn New York 11217

8. Chandra Perry- Patterson- Parole Hearing Officer- Rikers Island Judicial Center-East Elmhurst New York .

9. Andrea Evans-Chairwoman and Chief Executive Officer- State Of New York-Executive Department-Division Of Parole- 97 Central Avenue- Albany, New York 11206.

10. Linda Gabriele- Operations Officer- State Of New York-Executive Department-Division Of Parole- 97 Central Avenue- Albany, New York 11206.

11. John Lowery- Deputy Director of Operations- State Of New York-Executive Department-Division Of Parole- 97 Central Avenue- Albany , New York 11206 .

12. Milton Brown- Regional Director-NYS Division Of Parole- 92-36 Merrick Blvd-Queens, NY 11433.

### JURISDICTION/VENUE

1. This Court has jurisdiction over this Action based under 28 U.S.C. $1331. The acts occurred in the County of Brooklyn, City of New York.

### DAMAGES REQUESTED

1. Plaintiff seeks 10 Million Dollars in damages for the deprivations and or violations that the Defendants knowingly and intentionally inflicted upon the Plaintiff.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

1. Plaintiff called and sent e-mail complaints to the Parole head office in Albany. He always received e-mail responces from the Albany Defendants telling him to speak with his assigned Parole Officer or the Supervising Parole Officer.

2. There is no formal Grievance procedure or exhaustion process reguarding the Defendants. Plaintiff was repeatedly retaliated against for exercising his First Amendment Right to Freedom of Speech by the defendants in the context of repeated threats, forcing me to move, humiliating and degrading statements and acts and then,

2

3. On May 23rd, 2010, Plaintiff once again sent another e-mail complaint to Albany Parole and on the 24th day of may, 2010, when Plaintiff went to see his Parole Officer, Defendant Glenda Bubb, she went and got Defendant Denise Granum, supervising Parole Officer and she came into P.O. (P.O. is Parole Officer thereafter) Bubbs cubicle and stated, "Mr. Ritchie, since you like sending e-mails complaints to Albany, we are now violating you, turn around and put your hands up". I complied and handcuffs were placed around my hands, ( please see below for more detailed information).

4. Defendants did not act in the scope of their duties as Parole Officials. Defendants are not immune from liability. Defendants either directly participated in the wrong and or had knowledge of the wrong and failed/refused and or neglected to correct. Defendants in supervisory capacity had the power, jurisdiction and or authority to correct the wrong and the they not only did not correct, they added to and contributed further to the deprivations and violations of the Plaintiff's rights.

### VIOLATIONS/DEPRIVATIONS OF THE PLAINTIFF'S RIGHTS

A.  The defendants knowingly and intentionally violated/deprived the Plaintiff of the following rights guaranteed to him-

1.   1st Amendment-Plaintiff was deprived his right to freedom of speech/expression and to file grievances without being retaliated against,

2.  8th Amendment-Cruel and Unusual Punishment,

3.  1st and 8th Amendment-Retaliation,

4.  5th Amendment-Double Jeopardy-Issues in the complaint will show this allegation as being proved. Plaintiff is not challenging the crime of his guilty plea or sentence . Many of the Parole's rules, guidelines, laws, regulations, special conditions, ect, are a continued and repeated punishment on top and after the prison sentence and this is therefore not a civil or administrative issue,

5.  5th Amendment-Plaintiff was unjustly deprived of his right of life, liberty and or property. In addition to seeking damages for the Defendants wrong and intentional acts, Plaintiff requests that this Court issue orders directing the Defendants to properly change it's rules, guidelines, laws, regulations, special conditions to comply with the Laws.

### STATEMENT OF FACTS

1.  On May 23rd, 2010, Plaintiff once again sent another e-mail complaint to Albany Parole and on the 24th day of may, 2010, when Plaintiff went to see his Parole Officer, Defendant Glenda Bubb, she went and got Defendant Denise Granum, supervising Parole Officer and she came into P.O. Bubbs cubicle and stated, "Mr.

Ritchie, since you like sending e-mails complaints to Albany, we are now

violating you, turn around and put your hands up". I complied and handcuffs were placed on my hands.

2. This complaint that the Plaintiff made was within his constitutional right to freedom of speech/expression and to file grievances. My belongings were taken, P.O. Bubb began to go through my papers in my book bag. She then accused me of moving without notifying her or any parole official when I did and had received her permission to move but had not been able to find a suitable place to live.. She began asking questions as to my whereabouts for the prior week. I told her that for each day that I was not accounted for, I was in a psychiatric hospital and had in fact not changed my place of residence. I had discharge papers from the psychiatric hospitals and she took all but 1 of them.

3. The complaint I made to Albany was about the following- P.O. Bubb had me living at an illegal conversion/3 quarter House that Parole's own documentation states that placement in a 3 quarter house or shelter is not recommended. At this 3 quarter house, there were residents that were using and abusing drugs and or alcohol. I stated and wrote to P.O. Bubb, Granum. Feliciano, Capers, Smith, and all Albany Defendants that I was sevearely abused by the family fromthe age of 5 through 11 and I had remembered them using drugs and or drinking and that living in this environment made me have flashbacks and be depressed.

4. The Director of this 3 Quarter House, Trinity Project located at 469 East 25th Street in Brooklyn is directly across the street from a day care center (Please see below for additional information), this Director was abusing Hereion. Residents were having physical fights in the house, They were carrying illegal weapons in the house with the director knowing and not doing anything when the rules stated that residents would be discharged if they did these things. Residents were going into my room and stealing my and my roommates things. There was no door to my bedroom which under NYC housing laws, was required along with a lock. The director refused to pay for the things that were stolen from anyone. These issues were told to defendants Bubb, Granum, Feliciano and to all Albany Defendants.

5. Plaintiff sent an e-mail to PO Bubb dated 5/10/10 . I have a copy of this 2 page e-mail. PO Bubb lied at the Preliminary hearing.  I have a copy of the minutes and in the Parole Violation charges when she stated that this e-mail was 3 pages when it was 2 pages, (noting this because she lied numerous times even in their own documentation)

6. Over 100 e-mails, most were to Parole and State Officials reguarding the Parole issues were deleted after making a prior e-mail complaint reguarding Defendant PO Capers and Supervising Parole Officer R. Smith. I was told by PO Capers that if I did not give him my e-mail address and password, that he was going to violate

4

me. I complied and within 3 days of giving him the e-mail address and password, this was about 3 days before PO Bubb got my case, all my e-mails disappeared. Plaintiff made a F.O.I.L. request for all e-mails that I and my case manager sent to Parole and Iam waiting for a response. If they do not comply, I will seek in Discovery.

7.  Plaintiff then contacted the New York State Division of Criminal Justice Services and asked them if Parole was allowed to access my e-mail account and a supervisor told me that they were not allowed to even have my e-mail address and password without a warrant.

8.  The e-mail that Plaintiff sent to PO Bubb and Albany dated 5/10/10 described the situations occurring at the 3 quarter house requesting to move to a rooming house which most are generally furnished. Parole Conditions state that Iam not supposed to be around people that drink, do drugs or be around weapons,

9.  The next time I met with PO Bubb (5/10/10 at 2: 45 P.M.),(That time, Parole was giving out appointments to parolees) she told me that it was ok for me to move. She stated", just don't ask parole to get involved with your current housing situation".

10. I found a room, had to call and leave numerous messages, which she never returned a call, I just had to wait for her to deceide to answer her phone and told her the address of the room. Parole rules state that I must have a residence approved prior to moving and that I cannot live 1000 feet from a school, daycare or play ground or even be around one. These special conditions specifically state-"Unless approved by Parole".

11. This Trinity Project that she had me living was directly across the street from a day care center, the parole office was directly across the street from a playground, the day treatment program that they had me going to, (285 Schermerhorn Stree in Brooklyn) for over a year was directly across the street from a school, and this day treatment program had floor with adolecents on them. At each residence that Parole had me living, their were children/teens that lived next door. Based on my specific situation, the residence rule is a violation/deprivation of the 4th and 5th Amendments of the United States Constitution/Bill of Rights.

12. Plaintiff gave Bubb the new address, she checked and told me it was ok for me to move. I then found out that the room was not furnished. They wanted $350.00 a month rent and $350.00 security to move in. I could not afford a bed or dresser. I called Bubb over a dozen times to let her know and when I got through to her she told me, "Iam sure you can get your girlfriend to give you the money for a bed and dresser", and hung up the phone on me.

13. I then called and called her back and left messages that my girlfriend was on social security herself and did not have the money to give me for a bed and

5

dresser. I then found a furnished room located in the Bronx , called Bubb, Granum and Feliciano dozens of times to try and get the approval to move to this address and they refused to return my calls. My moving to the Bronx would have changed the assigned Parole Office/ Parole Officer.

14. Defendants Capers, Smith, Bubb and Granum told me repeatedly to go to a shelter for months. Prior to getting out of jail on the Parole Violation for 7 months, (From 5/24/10 through 12/8/10), Parole had to approve a residence before I could be released. A Place , E.A.C. Link, that works with Parole, found me a place, another 3 quarter house, and when I reported the day after I got out of jail, they told me that I could not go to that address. They found another address and told me that I could not go there and that I had to go to a shelter and if I did not bring them back proof that I was in a shelter, they were going to violate me again. I then proceeded to EAC Link, which is funded by the NYC Department of Health and mental Hygiene and they found me another address to go to in Queens that finally Defendant Granum approved for me to go.

15. Prior to that, when the Plaintiff was in a mental hospital, ( Gracie Square ) for 5 weeks, they, the psychiatrist and social worker agreed to keep me in the mental hospital to find me suitable housing in a mental health facility. Defendant PO Capers and R. Smith told me that If I did not sign myself out of the hospital against medical advice, and go to a shelter, they were going to violate me. I signed myself out as they ordered, the hospital initially put me in a hotel in Queens for a week, then prior to the week being up, Capers and Smith told me to go to a shelter or be violated. I again sent Albany and them E-mails and I was then sent to another 3 quarter house.

16. I informed Defendants Capers, Smith, Bubb, Granum, Feliciano and Albany Defendants numerous times that since I was sevearly physically and sexually abused as a child and teenager ( from age 5 on through 13) that I could not live in the type of setting of a shelter. Being in a 3 quarter house with a lot of males doing what they were was difficult enough.

17. The Case Manager at the day treatment program I attended for over a year, Jessica Sebastian, (718-310-5812- or 5809) sent e-mails on my behalf to Albany Defendants who just responded to her to contact the assigned parole officer or supervising parole officer. The Case Worker also called Capers, Smith, Bubb and Granum many times and left messages reguarding my emotional/mental state when I told her over and over that Parole wanted me to go to a shelter. None of these Defendants ever called her back. She also sent Capers and Bubb e-mails which they also never responded to. Supervising Parole Officer R. Smith told Plaintiff, "when you or anyone else send a e-mail to any one of us, big brother in Albany can also see the e-mail.

18. While I was a patient at Gracie Square Hospital's Psychiatric Unit, The doctor was going to send me with a mental health staff to the dentist. P.O. Capers told me, "if you leave the hospital for any reason, to go to the dentist or for a housing interviewm Iam going to violate you".

19. In over a year that I attended the Day Treatment Program, Project Moving On, Capers nor Bubb ever contacted the Program to see if I was going. Other than having to move around a lot, I attended as much as I could. They never checked because they knew that as per their conditions of Parole, I had to go or be violated and they knew that I was petrified of going back to prison. Note: While in Prison, I was physically assaulted 6 times and 1 time sexually by Correction Officer because the way that the NYS Dept of Correctional Services had my charges written in their system, it implied that I physically acted out against children. 4 Federal Complaints filed, 2 in the Northern and 2 in the Western Districts, all settled.

20. As Plaintiff stated to PO Bubb in the 5/10/10 e-mail, the Dept Of Correctional Services initially classified me as  Medium Security. My sentence was 2 and three fourths to 5 and a half years, non-violent. I fit that criteria. But due to my mental health history, diagnoised with sevear re-current depression, Post Tramatic Stress Disorder, Borderline Personality Disorder and Bi-Polar Disorder along with several serious suicide attempts, ( 2 overdoses while incarserated and psychiatrically hospitalized 4 times at Bellevue Prison hospital), the DOCS had to classify me Mental Health Level 1 which this level required me to go to a Maximum Security Prison, specifically, as they stated at Downstate CF, for me to be in my own cell.

21. This was also told many times to Capers, R. Smith, Granum and Albany Defendants. All they had to do was contact DOCS and this would have been verified. But they kept on telling me over and over and kept trying to make and have me go to the shelter knowing how I was going to react.

22. Defendants Capers, Smith, Bubb and Granum threatened and retaliated against me each and every time I called or e-mailed Albany but went out of their way to make my life a living hell. As a child and teenager, I had no control of the abuses I endired, but as an adult, I believe that I do.

23. Parole Documentation states that Parole Officials are professionals and their jobs are to help you to do the right thing and not-re-offend. This is not what they did to me. Mabey they additionally treated me the way they did do to my crime, but this would also be against the Federal Statutes.

24. The Parole violations that PO Bubb, Granum and Feliciano gave me, that they used to retaliate against me for sending e-mail complaints about them to Albany, to lock me up from 5/24/10 to 12/8/10, 7 and a half months, ( Note: Per Parole Guidelines, the Final Hearing was to be completed within 90 days) was that I moved without notifying them which this charge did not hold at the Preliminary Hearing. The second Charge was that I

Was not truthful about my whereabouts for the week prior to 5/24/10 when I was in the Psychiatric Hospitals, had documentation to prove this, that they took all documents when they violated me, this did not hold at the Preliminary hearing.

25. Mote: I had been out of prison for 1 year and 2 months before this violation and no violation charge had anything to do with the commission of a crime. I always did what I was told reguardless. When Plaintiff met with the Preliminary Hearing legal aid attorney, Jane Siempre, after she spoke with me and read the violation papers, she stated, this Parole Officer if fucking crazy". The Legal Aid Attorney that was assigned to the Final Hearing, Nora Carrol stated to me, "amongst the Legal Aid Attorneys, PO Bubb is known to lie on parolees".

26. The Parole Violation Charge that was used to find probable cause to hold me in jail for 7 months and 14 days was that after they put the cuffs on me, took all my evidence and told me they were violating me for sending a e-mail complaint to Albany was that I stated that I would hand myself when they took the hand-cuffs off me.

27. I had previously threatened to kill myself to Bubb and Capers and other Parole Officials. It was apart of my mental illness. Under the law- when a person is a danger to themselves and or others, ( I have no record of violence or aggression towards others in over 150 psychiatric hospitalizations), they are required to be evaluated by a mental health professional.

28. There is no crime committed by an individual for threatening to kill themselves. Defendant Charles Feliciano, Bureau Chief wrote in documentation, (Chrono Report) that I made the threat to kill myself and that I refused to go for a mental health evaluation.

29. Just like I could not refuse to go back to jail, I under the Law, could not refuse a mental health evaluation once I indicated that I was going to hand myself when they took the hand-cuffs off of me. Upon information and belief, Defendant Feliciano was not even present at the office when I made this threat. When Bubb and Granum violated me, I asked for Defendant Feliciano and they told me he was not there.

30. In a meeting at the Parole Office shortly after sending a different e-mail complaint dated 4/23/10 in which PO Bubb again lied in the case summary and in the Preliminary hearing, ( I have the minute record as well as a copy of this e-mail) by saying it was a 3 page complaint when it was 1 page, in the conference room were Defendants Bubb, Granum, Smith and Feliciano. When Feliciano entered the room and introduced himself, I stated to him, "You're the person Ive called many times and you never pick up or return my messages". Feliciano stated, "hey asshole, I pick up the phone all fucking day long".

31. This meeting shortly after sending this particular e-mail dated 4/23/10 was called by Defendant PO Bubb because, and as she stated in the Preliminary Hearing minutes, she claim, alledged, although she states no one else did, nor was I violated on that date, that this e-mail contained a threat.

32. The e-mail I sent dated 4/23/10 had a paragraph about my e-mails being deleted by someone in PO Capers or Bubb and about them not wanting me to use a computer along with the law that I had a right to send e-mail complaints. Everything is pretty much done over the computer these days. Either Feliciano or Granum wrote under this paragraph, "No need for warrant". This further proves that they were trying to find a reason/excuse to retaliate aginst me and lock me up and then when they could not come up with a legitimate reason, they lied.

33. Once Defendant PO Bubb was assigned to me on or about 4/5/10, she did everything in her power to violate me. She forced me to go to 2 places, 2 programs, 1 a drug/alcohol treatment program when I never had that problem and she had me sign/forge my legal last name that I would attend this program, I would be violated. This Program was called Metropolitan Life Skills. I complied and went to the intake appointment. I did not lie, I told them that I did not drink or do drugs.

34. When I made complaints about the above, I was already attending a day treatment program for over a year and Medicade would not pay for me to attend 2 programs, Bubb said that I did not have to go and she then ordered me to go to another Program called Shiloh and this Program was for Sex Offender Counseling. She again had me forge my legal last name on a special condition which said and she told me verbally as well, if I did not comply, I would be violated. I complied and went to the intake appointments.

35. Plaintiff successfully took and completed the Sex Offender Counseling and Treatment Program in Prison so this again was Double Jeapordy, being punished for the same crime 2 times. Bubb got mad at me when I told her that when Capers was my Parole Officer, he did not make me go to any other programs thatn the one I was already attending which was set up by the hospital, North General.

36. The crime I pled guilty too- For approximately 1 month prior to being arrested on or about July 27th of 2005, I became mentally sick. I was withdrawing, locking myself in my room, not showering for weeks, urinating in a bottle and throwing it under my bed, not taking my medication, abusing sleeping pills, stopped going to therapy appointments and I was on the computer 22 hour a day literally. This information is stated in mental health documents and the sentencing minutes that I have as did Parole.

37. I met someone in a chat room that had a similar past as I did. He began sending me illegal pictures and videos in e-mails and instant messages with the instructions, I did not know anything about computers other than to type and send e-mails at that time, on how to upload and download these pictures and videos on the computer boards and other addresses.

38. I was told how to upload and download these pictures and videos. I received hundreds of thousands of replies in e-mails and instant messages telling me I was a god, a king, that I was liked and loved and begged for more. This is the only reason I did it. I was in a manic-depressive state of mind. Again, documents that I and Parole have proves this.

39. I never lied or denied what I did. I never received sexual gratification or money. Prior to the arrest, I had several jobs working with abused/neglected children/teens and was never accused of any type of abuse. I had 2 children ages 3 and 5 and I did not even believe in yelling or cursing around them or any form of physical punishment. I was told by the lawyer that represented me, Bruce Klein, that the only reason I did not get probation instead of the prison sentence is that I had a prior felony, unrelated, 9 and a half prior, not 10 years and I was a predicate felon mandating that I serve a prison sentence.

40. At the Preliminary Hearing, Defendant Bubb and the Hearing officer, Defendant Patterson, they both mentioned my crime right before they made the excuse to hold me in jail for 7 months and 14 days because I threatened to kill myself. This is double Jeopardy. A person cannot be imprisoned for the same crime 2 times and the fact that they both mentioned my prior crime, when this parole violation was in no way in relation to any crime, proves this, right before the hearing concluded. It was atleast a 3 hour hearing.

41. The Preliminary hearing Attorney that represented me asked Bubb numerous times if Bubb knew about my being abused and mental health problems and she answered yes. Defendant Patterson, initially said that Bubb never said yes that I was abused as a child. Defendant Patterson works for Parole. She was not fair and impartical. When Parole Violation charge 2 and 1 were found with no merit, 2 times there was an adjournment, each time Bubb and Patterson were in the hallway talking and joking with each other.

42. The Preliminary Hearing Record also proves that they used an e-mail that I sent to Bubb 1 month and 1 day prior to the Parole Violation as another and incorrect/unjust reason to keep me incarserated. NOTE; This e-mail dated 4/23/10 was not submitted with the Parole Violation charges, or any other document and was presented on the Preliminary Hearing date and the judge allowed it to be admitted into evidence

43. The threat I made to kill myself on 5/24/10, was after they violated me on the other 2 charges, (lies) that did not stick at the Preliminary Hearing.

44. The crime I pled guilty too, does not fall under Penal Code Section 130 (SARA). Iam a Level 1 Designation-Low risk of repeat offence. Level 1's do not re-offend doing the same or similar crime. Not being able to live somewhere deprives the Plaintiff the right to be at liberty and live freely.

45. A school, Day Care Center or Playground is pretty much everywhere within 1000 feet in New York City. GOVERNORS APPROVAL MESSAGE- Chapter 568 of the Laws of 2008- "This Bill recognizes that the placement of these offenders in the community has been and will continue to be a matter that is properly addressed by the State". The State has done nothing. Sending a person with mental problems to an unlicensed and illegal 3 quarter house, when all of them are filled with violent felons, drug addicts and alcoholics, that carry dangerous weapons and fighting is the State not doing anything but creating additional problems.

46. Parole Documentation I have states, "Your Parole Officer must approve any residence that you propose to live in and will conduct an investigation of that residence to make sure it is a suitable place, does not violate any of the conditions of your release and will not hurt your chances to successfully complete parole". "Placement in a shelter is not a preferred residence program". If they followed this regulation, they would have never sent me to these houses. When I notified them of what was going on, they tried to send me to a shelter over and over and did nothing. These Parole Officers and Parole Supervisors spoke to these Directors/House Managers of these programs.

47. I had requested to live with my girlfriend at the time I resided at the Trinity Project and after and then after being released from the Parole Violation in December of 2010 and Bubb and Granum and Feliciano refused. They were told that she was 54 yrs old, (she went to the office and met with PO Thompson and Supervisor R. Smith previously), she did not drink or do drugs, she was never in trouble with the law before and she had her own apartment. She did not live within 100 feet of a school, day care or playground. They still said no.

48. When Plaintiff was going back and forth to Parole Court, approximately 6 times in the 7 months and 14 days I was locked up on the retaliatory parole violation, Defendant Peshkin, Parole Revocation Specialist told the assigned judges and Legal Aid that Parole would not permit me to go to another 3 quarter house and that I would have to remain locked up until they found me a 24 hour staff supervised residence for mentally ill individuals. Now they were all of a sudden concerned. He knew that it would be impossible for me to even be interviewed for a mental health apartment program/ 24 hour staff supervised residence with on-site services since I was locked up at Rikers Island.

49. Defendant Peshkin had all the paperwork and had to have known what occurred. My Parole Experiation Date was 1/24/11. In November of 2010, at Court, (exactly 3 weeks prior to December 8th, 2010), Peshkin told the judge and Legal Aid that they would now allow me to be released and to go to another 3 Quarter House. Parole agreed for 1 location, then after I got out, said no that I would have to go to a shelter or be violated.

50. Parole was referred to another location of a different 3 quarter house and that was denied. They again told me to go to Bellevue mens shelter, bring them documentation that I went there or I was going to be violated again. I just got out from Jail and they were already trying to violate me again for no reason, knowing that I could not emotionally or mentally handle going to a shelter.

51. Plaintiff proceeded to EAC Link, an agency that works with mentally ill, and a Supervisor there found a 3 quarter house, spoke to Granum, got permission for me to go and gave me a letter to verify that she spoke to Granum and received permission for me to go to this 3 quarter House.

52. Upon Information and belief, Per Parole Regulations/Guidelines, the Final Hearing was to be completed within 90 days of the final hearing, not 7 months and 14 days. `

53. On or about 4/5/10, Plaintiff met with PO Bubb for the first time. She states in the Parole Violation documentation that I made numerous complaints against my former Parole Officer that worked in her office to Albany. At no time did she indicate that I was making these complaints against that P.O., Defendant Capers improperly, meaing yelling, screaming, cursing in the office ect.

54. On 4/5/10, I had an appointment, (they gave cards with the appointment on it) to see Bubb. She purposely made me wait over 2 hours before seeing me. ON later Parole visit dates, when I was with her in her cubicle, Parole staff would come in and tell her that another Parolee went to a supervisor because she was making them wait a long time, and she would tell her partner and that PO that she was going to make that parolee wait even longer. On another date, Bubb opened the door called a parolees name, and shouted, "why did you call Albany on me".

55. On 4/5/10, when Bubb opened the door, I asked her in a low tone of voice how much longer it would be after already waiting 2 hours, I was sitting 1 foot away from her, and she screamed, "youll see me when I call you and you can call Albany on me all you want, Iam not afraid of you, I don't care, Ill just violate you". There were many other Parolees in the waiting area that heard this. I then mumbled that I would call Albany.

56. Plaintiff then asked for Granum, Bubbs Supervisor, she came out, I explained what was going on, not yelling, screaming or cursing, and within 5 minutes, Bubb came out and got me, and when we passed Capers cubicle, she told him, "Ritchie said hes calling Albany on me", then they both laughed.

57. After I met with PO Bubb on 4/5/10, I saw PO Sutherland, 3rd Party Defendant, who asked me, "Why was Bubb Yelling at you". I had met PO Sutherland for atleast 1hour on a prior report visit, the day after being released from a psychiatric hospital. This PO is trained and has knowledge of people with mental illness and that have abuse histories. We spoke about my past, my medications and about the way that PO Bubb was treating me. She told me that she would speak to Bubb and let her know about my condition. She appeared to be caring and concerned about my situation. She was present the day that Bubb, Granum and Feliciano Violated me.

58. Both in the Parole Violation papers and the Preliminary Hearing record, Bubb admits that I was "Adminished" for making e-mail complaints but lied and said that I yelled that I was calling Albany on her on 4/5/10 with 200 Parolees in the office. The seating arrangements only hold about 100 people. She said that it was my yelling, when I mumbled that I was admonished for.

59. On this date that I allegedly yelled that I was calling Albany was 4/5/10. I was not violated until the day after sending another e-mail complaint, more than 6 weeks later. Had I in fact screamed or yelled on front of everyone on 4/5/10, they would have had justification/reason to violate me on this particular date and I was not. I did not yell, I mumbled it. And to repeat, on 5/24/10, when I went for my office visit, Bubb came out and got me, brought me into her cubicle, went and got Granum, when Granum returned, she stated, "Ritchie, since you like to send e-mails complaints to Albany, your now being violated", at which time hand-cuffs were put on me.

60. In Bubbs cubicle on 4/5/10, she repeatedly stated and yelling it, You can call or send E-mails to Albany on me all you want, I don't care, Iam not afraid of you, Ill just violate you". She reapeted this statement atleast 50 times in the hour that she met with me. Granum's cubicle is right next to hers so Granum must have heard her yelling. Granum did come back and forth into Bubbs cubicle on this date, however, it was not to tell Bubb to stop yelling and threatening me. The next time I saw Bubb, she said the same thing over and over, the same statement as above, and again, she stated it atleast 50 times.

61. On 4/5/10, Bubb had me sign a lot of documents, many new and old Special Conditions. Even after showing her my Identification with the correct spelling of my legal last name, she had me sign/forge my legal last name along with my real last name. The Identification I showed her with the correct spelling of my last name was- Birth Certificate, Social Security Card, Public Assistance Card and Medicare Card. She went and got Granum, told me that if I did not sign my last name the way they wanted, they were going to violate me. I complied.

62. Referencing back to the e-mail compliant I sent dated 4/23/10, the last paragraph indicates her repeated threats that I would call Albany and that she didn't care ect, and that her acts would been seen as retaliatory and I implied that I was going to take legal action against Parole.

63. Prior to 4/5/10, I had Parole Officer Capers. As PO Bubb stated in the Parole Violation papers and in the Preliminary Hearing record, I had made numerous complaints against PO Capers.

64. Capers made degrading and humiliating statements about my netal illness. He placed me in an illegal unlicensed 3 quarter house that had the same things that occurring as at Trinity Project. IN retaliation to making complaints, many times, he had me going to see him 2 times a week instead of 1 time bi-weekly.

65. He gave me a drug/urine test and had me stand in the middle of the hallway where all the Parole Officers were and where Parolees were coming in and out from seeing their Parole Officers, he had me holding the filled urine cup in the air for atleast 10 minutes.

66. He ordered me to bring my girlfriend in to meet with him. She lived in the Bronx, took over 2 hours to get there, she was classified as disabled, told to him, he told me that if I did not bring her in to met him, he would bar me from seeing her and violate me. He told me a date and time to bring her. It was in the winter. (Date and time will show in the Chrono Report that I have FOILed.

67. I brought my girlfriend as instructed. PO Capers was not in the office this day. I was furious that he made me have her travel all that way, in that weather, with the threat, and he was not even there. I did not scream, yell or curse. I asked the receptionist for Defendant R. Smith, Capers Supervisor, he came out, I told him the situation, he met my girlfriend and put me and my girlfriend to report to PO Thompson, Capers partner that shared the cubicle with him.

68. The reason that Capers ordered me to bring my girlfriend was that he wanted to make sure that she knew about the crime of conviction. This was wrong. So PO Thompson aksed her if she knew about the crime and she said yes. She was a 54 yr old woman.. When I was at the Trinity Project, after sending a e-mail complaint to Alabny about Bubb, she called the Director Robert from Trinity Project and told him that I was a Sex offender, not going into any specifics. Then the Director told other residents in the house this and it made me feel very uncomfortable.

69. After being on Parole 4 months and not violating your conditions, all Parolees were given a curfew extension. I had been on Parole for over 8 months at this time. Capersd had level 2 and 3 sex offenders in his caseload that got their curfew extended after 4 months. I asked Capers for a 1 hour curfew extension only for 2 times a week, to see my girlfriend, as it took 2 hours to travel each way.

70. After sending a e-mail complaint against him prior, he came to where I was living at 2311A Pacific Street and stated to me, "Since you went on a bitchfest to Albany, Iam not allowing you to get a curfew extension".

71. This was on the same day that PO Capers forced me to give him my e-mail address and password threatening me that if I didn't give it to him, he was going to violate me. PO Hicks was with him. A few days after giving him the e-mail address and password, all my e-mails, over 100 of them, many were complaints against Parole, disappeared and a Department of Criminal Justice Services Supervisor told that he was not aloowed to even have the e-mail address or password.

72. Capers and R. Smith forced me to sign myself out of the psychiatric Unit( Social Worker Johnathan Kessler, Psychiatrist Dr Sussman) of Gracie Square Hospital against medical advice when the hospital was going to find me suitable mental health housing. Capers and Smith told me to sign myself out and go to a shelter or be violated. I sent more e-mail complaints. The hospital was going to send me with a staff to the dentist and Capers told me, "if you leave the hospital for any reason, to go to the dentist or for a housing interview, Im going to violate you".

73. ON or about November 3rd, 2009, I moved to 1308 Findlay Avenue in the Bronx . I received permission to move there prior from Capers. There was a huge Park down the block, ( Claremont ) from where I lived. It was my own furnished room. I payed 1 months rent and 1 months security to move in. I also payed 2 weeks additional rent to free more secure. My Girlfriend had brought me a television set and I then had cable and phone hook up. She also brought me a lot of clothes and kitchen supplies so that I could cook.

74. ON 11/21/09, someone that lived on the 2nd floor, I lived in the basement, later found out that it was a famous former basketball star, "Dean the dream Meminger", was appearently smoking crack and set the house on fire. It completely destroyed the house and 3 other houses. It was on several news stations and newpapers. I lost all my belongings. It was a very tramatic experience for me and I told Capers and R. Smmith this.

75. The American Red Cross put me/us up in a Hotel in Queens for 2 days. I was then sent to the New York City Housing Preservation and Development , (HPD). My case worker from the day treatment program saw that I was so emotionally and mentally tramatized by this experience, that she went with me to HPD. A HPD Supervisor met with us. I was sent to a Single Room Occupancy, own furnished room, share kitchen and bathroom with other disaster victims in the Bronx .

76. While staying at the Hotel in Queens for the 2 days, the morning after the fire, (it occurred at night) and the day after, I notified Cpaers and Smith of the situation. They immediately told me to go to a shelter or be violated. I sent e-mail complaints.

77. The American Red Cross had given me approximately 3 hundred dollars and a few clothing items. HPD Supervisor told me that I would stay at the emergency hotel in the Bronx for 4-6 months, rent free, to give me an opportunity to replace the things destroyed in the fire and from there HPD would find me my own

apartment and I would only have to pay 30% of my total income a month for rent. This would have been a dream come true.

78.  When I informed Capers and Smith of what is stated in #77 of this Complaint, the day after moving to the emergency hotel, he told me that the hotel was within 1000 feet of a private school and that I had a week to move and go into Bellevue mens shelter or be violated. I sent more e-mail complaints about this.

79. During the week that I was ordered to move, HPD Supervisor offered Capers and Smith over 12 locations, ( I have a letter from HPD) all refused by Capers and Smith. During this week, myself and my case worker called Capers and Smith dozens of times, sent e-mails, no response from either one of them to either myself or my case worker. Both of us then sent E-mails to Albany . I was then placed at 2311 A Pacific Street in Brooklyn , an unlicensed, illegal 3 quarter house by Capers and Smith.

80. After the fire, at the next Parole Office report date, I was talking about the fire to Capers, His partner, PO Thompson, who shares the same cubicle appearently heard something I was saying and asked Capers, "What happened to him". Capers began to laugh hysterically and told PO Thompson, "The motherfuckers house burnt down", referring to me. I sent a e-mail complaint to Albany about this.

81. Based on the situation that the fire destroyed where I was living, the impact it had on me, what HPD was going to do for me, that Parole documentation states, "unless approved by Parole", the fact that 2 other locations that parole allowed me to live was within the 1000 feet rule, that Capers and Smith refused 12 other locations that HPD Offered, and the plea and sentencing minutes that fully stated that I was mentally sick at the time I committed the crime, them forcing me to move from the emergency hotel was wrong, unjust and violated Plaintiff's right to life, liberty and or property.

82. It is obvious and evident that Parole Officials can do what they want, when they want, and get away with it no matter what. Them forcing me to move because of the 1000 feet rule is also a form of double jeopardy because I already served a prison sentence for a crime years prior and this rule is another punishment attached to the crime and after the fact.

83. 4 months prior to being Conditionally Released,( Parole denied my initial release due to the crime, I subsequently filed an Article 78 in Albany Supreme Court, the Court overturned Parole's deceision except that I received the Courts deceision 8 days prior to being Conditionally Released), Plaintiff met with the facility Parole Officer and Mental Health Discharge Planning. They told me that due to my past and current mental health history, they would find me a suitable place to live and that I could not be placed in a shelter. They filled out several different applications, they filled them all out incorrectly.

84. IN January of 2009, I was brought from Clinton CF to Rikers Island to go to Court to receive the Sex Offender Designation, (SORA Hearing) and I was given a level 1, low

risk of repeat offence. During the 2 and a half to 3 weeks period that I was in NYC for the Court hearing, I was placed in Bellevues Psychiatric Prison Unit. During this time, I spoke with Defendant Milton Brown, Regional Director for Parole atleast 10 times. He told me that due to my abuse history and mental health history, Parole would find me somewhere to live, not a shelter, before I was released from prison.

85. ON 3/23/09, the day before I was conditionally released, Facility Parole Officer came and told me that I had to go to the Bellevue Mens Shelter and to report to a Manhatten Parole Office and see PO Lew Meyer within 24 hours of release. When released on 3.24.09, I could not go to the shelter and walked to the Parole Office and waited there all night, told this to Milton Brown in a message that I left and then told to Lew Meyer when I met with him. I was in prison for 3 years and 9 months. The Prison was not giving me the correct medications and dosages that I was supposed to take.

86. When I met with PO Lew Meyer, he told me , "Parole does not provide housing". I informed him of the situation and he was understanding. He was trained in Mental Health issues. He told me that Defendant Milton Brown called him and told him to tell me, "lose his phone number". I called and left messages thereafter for Defendant Brown reguarding issues with PO Capers, Smith, Bubb and Granum and he never responded again.

87.  PO Lew Meyer agreed that I should go for a psychiatric evaluation and within 24 hours of being released from prison, I was admitted to the psychiatric unit of North General Hospital . My treating psychiatrist stated to me and wrote in my chart that due to my history and present condition, that I could not go to a shelter or 3 quarter house.

88.  With PO Meyers permission, the hospital kept me 2 months to find a 24 hour staff supervised residence for mentally disabled. While in the hospital, with the PO 's permission, staff took me to the outside medicade office, social security 3 times and to housing interviews. I remained at the 24 hour residence from May through October of 2009 in which I then moved  independently to the Bronx furnished roon, 3 weeks after, the fire destroyed everything.

89.  Now that Iam off of Parole, the 1000 feet rule does not apply. Every time a Sex Offender moves, they have to go to the Sex Offender Monitoring Unit within 10 days  with documentation of their new address or be guilty of a class D felony.  This is another form of Double Jeopardy, Sex Offenders have to register once a year with the Department Of Criminal Justice Services and when they send you the form, it specifically states Sex Offender Monitoring Unit so the post mail and everyone that lives at you place of residence now knows that you're a registered Sex Offender.

90.  If a Sex Offender is going to be sick and twisted enough to commit another Sex Offence, where they live does not matter. For that, Parole should bar all sex offenders from going on the bus and train as well. The recidivision rate of a level 1 sex offender to commit the same or similar sex offence is next to none. There are too many punishments on top of one another, all in relation to the same crime.

This is double jeopardy and should be stopped. The prison sentence is the punishment. And these rules, regulations, requirements are not civil or administrative because they are in relation to and a continued form of punishment for the same initial offence.

### IN SUMMARY AND CONCLUSION

1. The Defendants retaliated against me repeatedly for exercising my Constitutional Right to Freedom Of Speech and to file grievances. They knowingly and intentionally violated and deprived me of these rights. They lied and unjustly placed me in jail for 7 months and 14 days specifically telling me when they placed the hand cuffs on me, "Since you like sending complaints to Albany , were now violating you". IN the Preliminary Hearing, the Parole Officer and the Hearing Officer also referenced the crime I was already convicted of years prior as another excuse to keep me locked up.

2. When Albany Parole Officials are contacted by parolees with allegations of abuse they are receiving from Parole Officials, they need to do more than just refer the problem right back to the source of the problem having to know that all that is going to occur is some for of retaliation. They need to have an inspector generals office, an office independent from parole, to investigate. Essentially, the acts committed by PO Capers and PO Bubb constitute aggravated harassment.

3. Many of Parole's rules and regulations are a form of double jeopardy. These are not a civil or administrative issue, they are related to and in addition to the initial punishment of the prison sentence.

4. Depriving someone a safe place to live is unconstitutional especially when the defendants ordered me to live at places that violated their own parole conditions. NO drugs, no alcohol, no weapons nor being around anyone that does such is what their conditions state. Other conditions/paperwork they have state that they conduct investigations into places that they allow you to live to make sure your chances of successfully complete Parole does not become hampered.

5. They initially attempted to bar me first, then threatened to violated me repeatedly for using the computer to send e-mail complaints against them. Then they illegally force me to give me e-mail address and password, 3 days later, all my e-mails disappeared. Sending e-mail complaints is not a crime. Exercising your right to freedom of speech is not a crime.

6. Prior to the filing of this Complaint, Plaintiff sent a copy of this Complaint via e-mail to the NYS Attorney General's Office, The Governor's Office and the Comptroller's Office as required by the Federal Rules Of Civil Procedure seeking to settle/resolve these matters without taking action and these Administrators did not respond.

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

                                                                              12

1    when he was discharged from Lenox Hill, the 22nd and the 23rd.

2              MS. SAMPEUR:    Hearing Officer Patterson, my objection

3    regarding this specific McGee issue is my client's right to

4    confrontation and the necessity of representatives from the

5    hospital still stands as my prior objection.

6              THE HEARING OFFICER:    I hear you, Counselor.

7              P.O. BUBB:    Your Honor, the hospital records people

8    are not going to come in and testify about giving out information

9    about dates that they are seeing on the computer.

10             THE HEARING OFFICER:    Again, Division, if you are

11   alleging that then the evidence should have been in hand before

12   the charge was drafted or at least if not in hand at least known

13   to be available.  If you are saying that you know for a fact that

14   no one from the hospital is going to come how am I to determine

15   other than your own testimony because there are constitutional and

16   civil rights that are being placed in jeopardy if I'm to believe

17   your sworn testimony in regard to an allegation, and I really have

18   to sustain the objection raised by counsel in regard to at least

19   the good faith efforts, if any, that the Division made to find out

20   if there was staffing available from the hospital, if there were

21   subpoenas issued for staff from the hospital, and what that

22   response was from the hospital as to their policy, because I know

23   with the HIPA law, the health insurance -- the confidentiality and

24   all those issues, I mean the release of information documentation,

25   I mean there's a lot of things that go into whether or not anyone

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

1    from the hospital can testify in these proceedings, however, I'm

2    not even hearing that there were efforts made besides the

3    telephone call to have someone to come in on behalf of the

4    Division of Parole.

5           Based upon what I'm hearing I can't even see a prima

6    facia case as far as what you are offering unless you have

7    something further than your testimony in regards to whether or not

8    he was in and out of the hospital, and your testimony is also

9    taken into context as being valid, however, it has to be a

10   preponderance at this point.

11          So, do you want to amend the charge?  Do you want to go

12   forward with another charge?

13          P.O. BUBB:    I would like to go forward with another

14   charge.

15          THE HEARING OFFICER:    Okay.  So what charge?

16          P.O. BUBB:    Number one.

17          MS. SAMPEUR:    Hearing Officer Patterson, if I may have

18   a moment to consult with my client on that charge.

19          THE HEARING OFFICER:    All right.

20          (A recess was taken.)

21          THE HEARING OFFICER:    We are back on the record in the

22   matter of Seth Richie.

23          Parole officer, can you read charge number one into the

24   record.

25          P.O. BUBB:    "Seth, Richie violated rule number four of

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

                                                                              14

1    the conditions governing his release to parole supervision, in

2    that on or before May 17, 2010 he changed his approved residence *In hospital*

3    of 469 East 25th Street, Brooklyn, New York Avenue without *even by her*
     *consultation*

4    notifying his parole officer or any representative of the New York

5    State Division of Parole.  This information was obtained during a

6    home visit conducted at above residence on May 18th at which time

7    Parole Officer Bubb interviewed Robert Guiffo, Director of the

8    above residence."

9            THE HEARING OFFICER:    I see G-R-U-F-F-O.

10           P.O. BUBB:    It's a typo.  His correct spelling is

11   G-U-I-F-F-O.

12           THE HEARING OFFICER:    Are you amending the charge or

13   are you indicating -- what are you indicating?

14           P.O. BUBB:    I have to amend the charge to the correct

15   spelling of his name.

16           THE HEARING OFFICER:    Technically, yes, because it

17   could be a different person at that program with that spelling

18   that was on the original charge.

19           P.O. BUBB:    Okay.

20           THE HEARING OFFICER:    It's either in order for you to

21   present this case today the options are to either withdraw or to

22   amend, and if you amend you have to adjourn it.

23           P.O. BUBB:    And if I withdraw this charge I can't go

24   on it again ever?

25           THE HEARING OFFICER:    Not withdraw the charge.

Richie, Seth                    DIN # 07A5833           NYSID # 05741233R

15

1     Withdraw that portion.

2              MS. SAMPEUR:    I'm sorry, is that not an amendment of

3     the charge removing portions of the charge?

4              THE HEARING OFFICER:    It's not an amendment if the

5     Division of Parole is indicating that this was a typographical

6     error and they don't need that.  I don't know.  I really can't

7     direct you how to do the case, Division.

8              P.O. BUBB:    I really don't need his name.

9              THE HEARING OFFICER:    So what are you proposing,

10    Division?

11             P.O. BUBB:    I would like to withdraw that portion.

12             THE HEARING OFFICER:    Which portion?

13             P.O. BUBB:    The Robert Guiffo.

14             MS. SAMPEUR:    Excuse me, Hearing Officer Patterson,

15    may I consult with my supervising attorney whether or not this

16    constitutes an amendment to the charge?

17             THE HEARING OFFICER:    Sure.

18             (A recess was taken.)

19             THE HEARING OFFICER:    Parole officer, you can confer

20    with the deputy chief of PVU who is Mr. Simpson I think today.

21             (A recess was taken.)

22             THE HEARING OFFICER:    We are back on the record in the

23    case of Mr. Seth Richie.

24             Parole officer, were you able to go speak to Deputy

25    Chief Simpson?

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

                                                                    16

1          P.O. BUBB:     Yes.

2          THE HEARING OFFICER:     And what did he advise you?

3          P.O. BUBB:     He said as long as I'm not changing

4    anything in the charge except a typographical error of the

5    person's name that I could state that for the record and he said

6    it would be your decision.

7          THE HEARING OFFICER:     It would be what?

8          P.O. BUBB:     Your decision.

9          MS. SAMPEUR:     After consulting with my supervising

10   attorney Mr. Lorraine McEvilley it is the Legal Aid Society's

11   position that any changes in the charge constitutes an amendment

12   for which we need actual notice for.

13         THE HEARING OFFICER:     I do agree any change you do

14   need notice for.  And, Counsel, you are at this point not waiving

15   your client's right to notice for the amendment of the change?

16         MS. SAMPEUR:     No, we are not.

17         THE HEARING OFFICER:     So, Division, are you asking for

18   the spelling from G-R-U-F-F-O to G-U-I-F-F-O?

19         P.O. BUBB:     Yes, but I would like to say if it's going

20   to be a problem I will go on another charge.

21         THE HEARING OFFICER:     Well, it wouldn't be a problem

22   just that you would have to take an adjournment.

23         P.O. BUBB:     No, I want to go on another charge.

24         THE HEARING OFFICER:     What charge is that?

25         P.O. BUBB:     Charge number three.

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth              DIN # 07A5833              NYSID # 05741233R

17

1            THE HEARING OFFICER:    Counsel, have you had an

2    opportunity to speak to your client in regard to charge number

3    three?

4            MS. SAMPEUR:    I have not.

5            THE HEARING OFFICER:    Okay.  Let corrections know.

6            (A recess was taken.)

7            THE HEARING OFFICER:    We are back on the record in the

8    matter of Seth Richie.

9            Parole officer, read charge number three into the

10   record.

11           P.O. BUBB:    "Seth Richie violated rule number eight of

12   the conditions governing his release to parole supervision, in

13   that on May 24 at approximately 3:30 p.m. at 333 Schermerhorn

14   Street he threatened the safety and well-being of himself when he

15   stated that he would hang himself when and if the P.O. removed the

16   handcuffs."

17           THE HEARING OFFICER:    Thank you.

18           Counsel, what is the plea to that charge?

19           MS. SAMPEUR:    Not guilty.

20           THE HEARING OFFICER:    Thank you.

21           Division, proceed with your case.

22           Mr. Richie was placed in handcuffs for failing to

23   respond truthfully to inquiries that I made about his residence,

24   his whereabouts, and when he was confronted with the

25   information --

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

                                                                          18

1          MS. SAMPEUR:    I'm sorry, what date was that?

2          P.O. BUBB:    May 24th during an office report.

3      When Mr. Richie had come into the office he told me that

4  he didn't take the apartment that I thought he had taken --

5          MS. SAMPEUR:    I am going to object to her testifying

6  regarding other charges.

7          P.O. BUBB:    No, no, no.

8          THE HEARING OFFICER:    Well, at this point, counsel,

9  unless you are going to stipulate that your client was at the

10  office and was taken into custody as a result of a warrant that

11  was issued, the Division of Parole has to give some foundation as

12  to what occurred during this alleged incident.  I don't know how

13  the Division of Parole could present the case concerning the

14  events that transpired without testifying as to why there was

15  actually -- there was action being taken by this officer.  Maybe

16  if without stipulation, Division, you could indicate through your

17  testimony that there was a discussion about some behavior that

18  occurred and a warrant was issued and you were trying to effect

19  that warrant and go from there.

20          Is that a safe medium?

21          P.O. BUBB:    Without giving the details basically is

22  what your saying?

23          THE HEARING OFFICER:    Without giving details as to the

24  behavior for the warrant itself but just what transpired after the

25  warrant and then go from there.

Richie, Seth            DIN # 07A5833          NYSID # 05741233R

19

1         P.O. BUBB:    Mr. Richie was placed in handcuffs after I

2   asked him a few questions.  He decided that he was going to stop

3   answering my questions and then he said, "it doesn't matter what

4   you ask me because as soon as you take the handcuffs off I am

5   going to hang myself." *I answered all questions she asked*

6         THE HEARING OFFICER:    Where was this?

7         P.O. BUBB:    This was in my office.

8         THE HEARING OFFICER:    Where is that located?

9         P.O. BUBB:    My reporting office is located at 333

10  Schermerhorn Street, Brooklyn, New York.

11        THE HEARING OFFICER:    About what time?

12        P.O. BUBB:    About 3:30, 4, in that area.

13        THE HEARING OFFICER:    Was this a regular office

14  report?

15        P.O. BUBB:    Yes, it was.

16        THE HEARING OFFICER:    Did you make a notation and

17  statements of what occurred in your chronological reports?

18        P.O. BUBB:    Yes.

19        THE HEARING OFFICER:    Do you have them with you

20  today?

21        P.O. BUBB:    Yes, I do.

22        It says May 24th about 3:30, is that the date and time?

23  MS. SAMPEUR:    May 24th, 4:00 p.m.  *After the fact*

24        P.O. BUBB:    Okay, sorry.

25        THE HEARING OFFICER:    Counsel, have you had an

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

20

1    opportunity to look at the entry?

2         MS. SAMPEUR:    Yes.

3         THE HEARING OFFICER:    I believe you indicated that the

4    entry is timed at 4:00 p.m.?

5         MS. SAMPEUR:    Yes.

6         THE HEARING OFFICER:    So you made the entry after the

7    incident?

8         P.O. BUBB:    Yes.

9         THE HEARING OFFICER:    And, counsel, you had an

10   opportunity to look at the entry.  Do you have any objection for

11   that coming in as evidence?

12        P.O. BUBB:    No objection to the entry coming into

13   evidence.

14        MS. SAMPEUR:    Can you read into the record since

15   there's no objection?

16        MS. SAMPEUR:    I'm sorry.  One second.

17        No objection to the portion of the entry specifically

18   discussing this charge and this charge only.  The entry contains a

19   number of information.

20        P.O. BUBB:    She wants me to read it specifically about

21   the hanging himself, that part?

22        MS. SAMPEUR:    Yes.

23        THE HEARING OFFICER:    So can you underline and then

24   read that portion.

25        P.O. BUBB:    My glasses broke.  I had another pair but

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

21

1    I don't know where they are.

2              THE HEARING OFFICER:    After counsel reads it I will

3    read it.

4              P.O. BUBB:    Thank you.

5              MS. SAMPEUR:    (Handing.)

6              THE HEARING OFFICER:    For the record, this is a New

7    York State Division of Parole chrono report.  The name on the

8    heading indicates Seth Richie with the same NYSID number that I

9    read into the record.

10             The entry as being read I put an asterisk next to it, it

11   was entered by Parole Officer Bubb on May 24th, 2010 at 4:00

12   p.m..  There was an office report with parolee.  The intro to this

13   was not underlined and from the portion that's underlined it

14   reads:  "He stated that it does not matter anyway because as soon

15   as you take these cuffs off I am going to hang myself."  And there

16   is quotations.

17             There was one other portion that I see that this writer

18   informs S.P.O. Granum of behavior and what I am going to underline

19   and his threat to harm himself so I will show you, Counsel, to

20   show that there was a conference.

21             MS. SAMPEUR:    Okay.

22             THE HEARING OFFICER:    So I am going to enter that entry

23   as State's Exhibit-2.

24             (Chrono entry was marked as State's Exhibit-2 in

25   evidence; 6-3-2010.)

7. Plaintiff is attempting to locate counsel to represent him, but realistically, since Iam labeled a sex offender, it will probably be next to impossible. I have knowledge of the FRCP and will do all necessary requirements to keep this Complaint going. With the documents that I have and with the ones that I have Foiled, I may file for summary judgement. Iam certain that the AAG that is assigned to this Complaint will ask for an extension, then file a Motion to Dismiss, anything to waist time and to avoid the real issues of the case.

8. It was necessary for the Plaintiff to go into full detail about the situations that occurred in this Complaint. Attached is a copy of the Preliminary Hearing Minutes which shows proof of many of my allegations. I have and will obtain additional proof that the defendants knowingly and intentionally violated and deprived me of my rights.

WHEREFORE, Plaintiff respectfully prays for judgement against the defedants in the amount of 10 million dollars and orders barring the defendants from continuing their double jeopardy actions and for such other and further relief as this Court may ddem just and proper.

Seth Ritchie, declares under penalty of perjury that everything stated is this Complaint is true and correct.

Dated: March 14, 2011

Seth Ritchie
Pro-Se Plaintiff
138 Grove Street
Brooklyn, N.Y. 11221
(347) 928-9000

19

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

                                                                              2

 1              THE HEARING OFFICER:    This is a preliminary hearing in

 2    the matter of Seth Richie, warrant number 604259, NYSID number

 3    5741233-R.

 4              Are you Seth Richie?

 5              THE PAROLEE:    Yes, ma'am.

 6              THE HEARING OFFICER:    Mr. Richie, my name is Chandra

 7    Perry-Patterson.  I'm a Preliminary Hearing Officer and I have

 8    been appointed by the Board of Parole and today I'm assigned to do

 9    your case.

10              Now, Mr. Richie, I am going to ask you as well as the

11    Division of Parole representative to raise your right hands to be

12    sworn in.

13              Do you swear or affirm the testimony you give today will

14    be truth, the whole truth and nothing but the truth, so help you

15    God?

16              P.O. BUBB:    Yes, ma'am.

17              THE PAROLEE:    Yes.

18              THE HEARING OFFICER:    Thank you both.

19              Parole officer, can you identify yourself for the

20    record, please.

21              P.O. BUBB:    Parole Officer Glenda Bubb, shield 1550,

22    Brooklyn V SOU.

23              THE HEARING OFFICER:    Thank you.

24              Sir, state your name for the record, please.

25              THE PAROLEE:    Seth Richie.

Richie, Seth                    DIN # 07A5833          NYSID # 05741233R

3

1          THE HEARING OFFICER:    Thank you, Mr. Richie.

2          Today representing you from the Legal Aid Society we

3    have.

4          MS. SAMPEUR:    Attorney Jane Sampeur of the Legal Aid

5    Society on behalf of Mr. Richie.

6          THE HEARING OFFICER:    Thank you.

7          Now, Mr. Richie, this is and administrative informal

8    hearing and the sole purpose is for me to make a determination as

9    to whether or not the Division of Parole had probable cause to

10   issue a warrant.

11         If I do make a finding of probable cause, sir, you are

12   going to be held over for what's called a final hearing,.

13         Do you understand?

14         THE PAROLEE:    Yes, ma'am.

15         THE HEARING OFFICER:    At this hearing, Mr. Richie, you

16   do have several rights and because you had an opportunity to speak

17   to your attorney I'm sure that she has explained your rights to

18   you.

19         Do you have any questions about your rights at this

20   hearing, sir?

21         THE PAROLEE:    No, ma'am.

22         THE HEARING OFFICER:    Counsel, did you have an

23   opportunity to review the papers that were served upon your

24   client?

25         MS. SAMPEUR:    Yes.

Richie, Seth                     DIN # 07A5833                NYSID # 05741233R

4

1          THE HEARING OFFICER:     Do you have any notice or

2    service issues you wish to raise at this time?

3          MS. SAMPEUR:     There are none that I'm aware of at the

4    moment.

5          THE HEARING OFFICER:     Parole officer, did you prepare

6    the documents during your regular course of business as a New York

7    State parole officer?

8          P.O. BUBB:     Yes.

9          THE HEARING OFFICER:     Can you attest to the

10   truthfulness and the accuracy of the documents to the best of your

11   knowledge?

12         P.O. BUBB:     Yes.

13         THE HEARING OFFICER:     With no notice or service issues

14   at this point I am going to enter all the documents in

15   collectively as State's Exhibit-1.

16         They are an accusatory instrument.

17         (VOP Package was marked as State's Exhibit-1 in

18   evidence; 6-3-2010.)

19         THE HEARING OFFICER:     Parole officer, what charge are

20   you ready to go forward with today?

21         P.O. BUBB:     Number two.

22         THE HEARING OFFICER:     Can you read the charge into the

23   record, please.

24         P.O. BUBB:     "Seth Richie violated rule number five of

25   the conditions governing his release to parole supervision, in

Richie, Seth                 DIN # 07A5833              NYSID # 05741233R

5

1    that he failed to reply truthfully to an inquiry by his parole

2    officer on 5-24-2010 when he stated that he was admitted into

3    various hospitals from May 17th through May 23, 2010."

4              THE HEARING OFFICER:    Counsel, what is the plea on

5    behalf of your client?

6              MS. SAMPEUR:    Hearing Officer Patterson, I would

7    actually ask that this charge be rewritten as it's facially

8    insufficient.

9              The charge as written doesn't state as a course the

10   manner in which he is alleged to have violated rule five in this

11   particular charge stating various hospitals between certain

12   dates.  None of that there states a specific cause of action or a

13   manner in what way he violated that rule.

14             THE HEARING OFFICER:    Division?

15             P.O. BUBB:    I would like to explain it.

16             THE HEARING OFFICER:    Not explain it.  What you have

17   here, are you saying that this is sufficient the way that you have

18   it written?

19             P.O. BUBB:    Yes.

20             THE HEARING OFFICER:    Without going into the

21   presentation of your case?

22             P.O. BUBB:    Yes.

23             THE HEARING OFFICER:    Okay.

24             Well, Counsel I'm seeing that rule number five says, "I

25   will reply promptly, fully and truthfully to any inquiry of or

Richie, Seth                    DIN # 07A5833                    NYSID # 05741233R

6

1    communication by my parole officer or other representative of the
2    Division of Parole."   The charge is written as such to allege that
3    there was an inquiry by his parole officer on May 24th and it's
4    alleged that Mr. Richie stated that he was admitted into various
5    hospitals from 5-17 through 5-23-10.

6             MS. SAMPEUR:    So just to be clear, with respect to the
7    way this charge is written, when he stated that he was admitted to
8    various hospitals from 5-17 to 5-23 that's what's alleged to have
9    been a lie or untruth?

10            P.O. BUBB:    Yes.

11            THE HEARING OFFICER:    That's what I'm reading and
12   that's the Division of Parole's burden.

13            So the charge has been read into the record.

14            Counsel, what is plea on behalf of your client?

15            MS. SAMPEUR:    Not guilty.

16            THE HEARING OFFICER:    Not guilty plea entered.

17            Division, proceed with your case.

18            P.O. BUBB:    I began supervising Mr. Richie April
19   2010.   Mr. Richie was living in a halfway house in one of the
20   precincts that I cover.   He had lots of complaints with the place
21   and I told him that if he didn't find another place to live that
22   he would have to enter the Bellevue Men's Shelter.   He informed me
23   that he could not live in the shelter because he's bipolar and he
24   has a problem with being around so many people --

25            MS. SAMPEUR:    I'm sorry, could you just slow down just

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                    DIN # 07A5833                NYSID # 05741233R

7

1    a little bit.

2              P.O. BUBB:     Where should I go back to?

3              MS. SAMPEUR:    Just pick up where you left off.

4              P.O. BUBB:     Okay.

5              So he informed me that he couldn't live in the shelter

6    system because there were too many people.  So then he said he

7    would go into a hospital.  I said, "You would have to stay in the

8    hospital, you can't just go one day and live someplace else.  You

9    have to maintain a stable residence and you have to go in a

10   shelter."  So he said, "Okay."  Then he called me and he said he

11   found a place, 437 Rogers Avenue.  I checked it out on Mapquest

12   because Mr. Richie has a condition that he can't live within 1,000

13   feet of schools, so any address that he proposes he has to inform

14   me so that I can check it out and give him the go ahead or no, he

15   can't live there or whatever.

16             THE HEARING OFFICER:    When was this?

17             P.O. BUBB:     I would have to peruse my chronos, but it

18   was prior to May 17th.  It was prior to that.  He found a place

19   and he called me and I approved it, but he didn't take the place

20   and he called me to say that he didn't take the place.

21             Now, Mr. Richie had been informed that you find a place

22   and for whatever reason it does not fall through you have to go

23   into the Bellevue Men's Shelter and bring me proof that you have

24   someplace to go.  He didn't do that.  He went into the hospital

25   but he wasn't admitted into the hospital.  He was seen in the

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

8

1    hospital on May 17th and he was seen again in the hospital on May

*I called or left her messages pertaining to this.*

2    18th.  I went to his house on May 18th and that's when I was told

3    by the housing -- director of the halfway house that he moved out

4    the day before.  So I said, "Okay, well maybe he took the place on

5    Rogers Avenue."  I didn't tell that to the housing manager, I just

6    said that's probably what he did, and I would wait to hear from

7    him.

8              So he came in on May 24th stating that place fell

9    through and that he was in the hospital.  So I checked the two

10   hospitals that he told me that he was in.

11             THE HEARING OFFICER:    What were they?

12             P.O. BUBB:    Lenox Hill Hospital and Montefiore

13   Hospital.  *I had paperwork from the hospitals that she took all but when they violated me*

14             THE HEARING OFFICER:    And how did you check?

15             P.O. BUBB:    I called on the phone and they transferred

16   me to medical records and I was told that on May 17th he was seen

17   in the hospital.

18             On May 18th he was seen in the hospital.  Both days he

19   was seen and released.

20             THE HEARING OFFICER:    Let me catch up with you because

21   I'm with counsel now.

22             You mentioned two hospitals and you mentioned two

23   dates?

24             P.O. BUBB:    Yes.

25             THE HEARING OFFICER:    You are saying on both dates he

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

9

1   went to both hospitals?

2            P.O. BUBB:    One hospital on two dates.

3            THE HEARING OFFICER:    Tell me which date.

4            P.O. BUBB:    May 17th he was seen at Montefiore

5   Hospital and released.

6            May 18th he went right back to the hospital.

7            THE HEARING OFFICER:    Which one?

8            P.O. BUBB:    Same hospital, Montefiore Hospital.  Seen

9   and released.

10           MS. SAMPEUR:    Excuse me, I am going to object to this

11  testimony.  Do you have any witnesses here from Montefiore

12  Hospital or Lenox Hospital?

13           P.O. BUBB:    No, I don't.

14           MS. SAMPEUR:    I am going to object to this testimony

15  on the specific grounds that unless the parole officer can

16  actually produce some sort of documentation or representatives

17  from the hospital to give the testimony as to whether or not -- as

18  to the dates and information and times in which my client is

19  alleged to have been at the hospital, her testimony alone is not

20  enough here, specially considering my client does occupy a rights

21  favored status and does have the right to cross-examine those who

22  are accusing him of charges here which she is alleging that he was

23  untruthful with respect to whether or not he was admitted into

24  various hospitals, and the heart of this very charge would entail

25  a representative from the hospital being able to testify as to

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

                                                                        10

1    whether or not he was, in fact, there.

2              THE HEARING OFFICER:    And, Division, what do you say

3    to that?

4              P.O. BUBB:    I say that my efforts to gather this

5    information actually helped her client because initially I thought

6    he wasn't telling me the truth about anything because he had no

7    documentation.  So then I called -- *She took all the documentation to prove I was in the hospital.*

8              MS. SAMPEUR:    I'm sorry --

9              THE PAROLEE:    That's not fair.  How could she just lie

10   like that.  It's not fair though.  This is my life.

11             THE HEARING OFFICER:    Mr. Richie --

12             THE PAROLEE:    I'm sorry, your Honor.

13             THE HEARING OFFICER:    You will have an opportunity

14   through your attorney.

15             Again, we are trying to keep this orderly and we also

16   have a court reporter who is trying to transcribe what everybody

17   is saying, so it helps if one person speaks at a time.

18             Now, Parole Officer, in regard to the objection raised,

19   do you have your chronos to indicate or do you have something from

20   the hospital, a letter of an individual who you spoke to or

21   someone from the admissions department?

22             P.O. BUBB:    No, ma'am, I don't have anyone from the

23   hospital.  When you call the hospital the only thing they can tell

24   you is if a person was seen there.  That's how I got confirmation

25   that he was in the next hospital for two nights. *Each day, I had documentation to provide my whereabouts. See also charges me with moving without permission (see next charge) when I did not move, I was in the hospital.*

                  PRECISE COURT REPORTING
       (516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                    DIN # 07A5833            NYSID # 05741233R

1        MS. SAMPEUR:    I'm sorry --

2        THE HEARING OFFICER:    Okay, but again --

3        P.O. BUBB:    Okay, I'm sorry.

4        THE HEARING OFFICER:    Because the allegation is that

5   Mr. Richie was untruthful about being admitted into various

6   hospitals.  What I'm hearing is that it's one hospital because you

7   are saying the other hospital he was admitted into, correct?

8        P.O. BUBB:    Yes.

9        THE HEARING OFFICER:    So the charge needs to be

10  amended because you are saying that it was one hospital not

11  various hospitals.

12       P.O. BUBB:    No, it was two hospitals.

13       THE HEARING OFFICER:    So what are the two hospitals?

14       P.O. BUBB:    It was Lenox Hill Hospital and Montefiore

15  Hospital. *She could not ever get her story straight.*

16       THE HEARING OFFICER:    So there is a third hospital in

17  which he was admitted because I just heard you say that he was

18  admitted and he slept overnight?

19       P.O. BUBB:    He slept overnight in Lenox Hill Hospital

20  for two nights, the 19th and 20th.  He was released on the 21st.

21       THE HEARING OFFICER:    So then he was admitted?

22       P.O. BUBB:    Yes, he was, but Mr. Richie said he was

23  admitted in the hospital from the 17th until I saw him.  I was

24  only trying to get him to tell me where he was on the nights that

25  he wasn't in the hospital, which would be the 17th, 18th, 21st

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

22

1          THE HEARING OFFICER:    So, parole officer, you are

2     indicating that the warrant was issued on 5-24-2010 and because

3     Mr. Richie had not been lodged at the time that this behavior

4     allegedly occurred you drafted and added charge number three and

5     attached it as part of the warrant, correct, because when the

6     warrant was issued the warrant was issued based upon all three

7     charges or just the two charges?

8          P.O. BUBB:    It was based on all three charges, and

9     Mr. Richie was taken into custody without his charges and was

10    served later.  He was taken in simply on the warrant.  And, you

11    know -- I don't know really know how to -- I'm afraid to speak

12    because everything leading up to that has to deal with the charges

13    that I was instructed not to talk about.

14         THE HEARING OFFICER:    Everything leading up to that --

15         P.O. BUBB:    His conversation with me about that was

16    because of the other stuff that we talked about and at this point

17    he decided that he was not going to talk to me anymore and he was

18    going to say that when he's done no matter what happens as soon as

19    I take the cuffs off of him, because I kept telling him just tell

20    me where you were because then you can, you know, go to the

21    shelter like you are supposed to.  He said, "It doesn't matter

22    because when you take these cuffs off me I am going to hang

23    myself."  At that point I said I have to call Granum in and I told

24    her, she discussed it with me, and then she discussed it with my

25    area supervisor and then they decided he would go and he went like

Richie, Seth                DIN # 07A5833           NYSID # 05741233R

23

1    that.

2              THE HEARING OFFICER:    Well, I just want to make it

3    clear for the record that in no way, shape or form do I want the

4    Division to feel hampered or fearful of making any statements or

5    testifying under oath.  What I was trying to do in preserving

6    Mr. Richie's rights as well as preserving the Division of Parole's

7    status as far as presenting their case was not to compound the

8    presentation by introducing any possible evidence or testimony

9    that might be alleged in charge number one and charge number two.

10             In fact, the behavior or the alleged behavior that might

11   have occurred on that date must have lead up to this incident

12   occurring in light of the fact that this was an office report, so

13   that in itself shows that the Division of Parole was interacting

14   with Mr. Richie prior to this statement that is being alleged in

15   this charge.

16             So even though it's not being said, Division of Parole,

17   I must tell you I'm taking that into context even though it's not

18   being actually presented the way you want to bring it out, but in

19   regard, again, to the statement, did you feel that the behavior

20   and the statements that were made were a violation in an important

21   respect?

22             P.O. BUBB:    Definitely.

23             THE HEARING OFFICER:    And why is that?

24             P.O. BUBB:    Because Mr. Richie is a sex offender.

25   This is not the first time he has threatened to harm himself, but

                         PRECISE COURT REPORTING
              (516) 747-9393  (718) 343-7227  (212) 581-2570

Richie, Seth                 DIN # 07A5833              NYSID # 05741233R

24

1    I thought he was serious.  And I felt like he is a threat to

2    himself and should not remain in the community.

3              THE HEARING OFFICER:   And that coupled with anything

4    else or just that in and of itself?

5              P.O. BUBB:   That coupled with other behaviors that
     *not violated in other office reports*
6    Mr. Richie exhibited in other office reports with me.  I should
                                                                   *grossly Double*
7    state for the record it has nothing to do with the charges.  I   *jeopardy*

8    would like the court to know that Mr. Richie was transferred to me

9    because of his previous behavior.  I was the parole officer

10   willing to work with him.  I'm the one who found the residence for

11   him that he moved from on 25th Street because Mr. Richie comes

12   into the office and he demands to be seen and he threatens to call

13   Albany when he is not seen, I guess when he thinks it's an

14   appropriate time, so a conference was held, and I don't remember

15   if he was involved in it, I wasn't involved in it, but a

16   conference was held for him to get another parole officer

17   because --   *because of what capes was doing to me*

18             THE HEARING OFFICER:   That's how you ended up

19   supervising him?

20             P.O. BUBB:   Yes, because Mr. Richie wants to do parole

21   the way he wants to do it on his terms.  *not true.*

22             THE HEARING OFFICER:   Okay.

23             Anything else at this time, Parole Officer?

24             P.O. BUBB:   No.

25             THE HEARING OFFICER:   Counsel.

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

25

1           MS. SAMPEUR:    Parole Officer Bubb, you are aware that

2   Mr. Richie has significant mental health issues, correct?

3           P.O. BUBB:    Yes.

4           MS. SAMPEUR:    And you are aware that he's been

5   hospitalized on previous occasions because of mental health

6   issues, correct?

7           P.O. BUBB:    Correct.

8           MS. SAMPEUR:    And you are also aware that he has

9   admitted himself voluntarily into mental health treatment as well,

10  correct?

11          P.O. BUBB:    I'm aware that Mr. Richie puts himself

12  into hospitals when he is told that he has to go to the shelter

13  because --

14          MS. SAMPEUR:    I'm sorry.  It's a yes or no question.

15          You are aware that Mr. Richie has admitted himself into

16  mental health hospitals, correct?

17          P.O. BUBB:    Correct.

18          MS. SAMPEUR:    And you are also aware that Mr. Richie's

19  mental health issues stems from various abuse as a child,

20  correct?

21          P.O. BUBB:    Yes.

22          MS. SAMPEUR:    Now, when you stated the reason for --

23  one of the reasons why I thought -- you thought Mr. Richie's

24  alleged threat of suicide or threat to harm himself was serious or

25  that the events and behavior that compounded and made this to be a

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                DIN # 07A5833           NYSID # 05741233R

26

1    serious threat, you mentioned the behavior being threatening to

2    call Albany.  Isn't it true that the reason why he was transferred

3    from the last parole officer, Parole Officer Capers specifically,

4    was because Mr. Richie filed an actual complaint with Albany

5    regarding P.O. Capers?

6              P.O. BUBB:   No, that's not why.  Mr. Richie --

7              MS. SAMPEUR:   I'm sorry.  It's a yes or no.

8              P.O. BUBB:   I said no, that's not why.

9              MS. SAMPEUR:   Isn't it true that Mr. Richie did, in

10   fact, file a complaint with Albany regarding his supervision under

11   Mr. Capers?

12             P.O. BUBB:   Mr. Richie made several complaints --

13             MS. SAMPEUR:   Just a yes or no.

14             P.O. BUBB:   Yes.

15             MS. SAMPEUR:   Isn't it true that Mr. Richie came into

16   the office on one occasion and because he expressed what is his

17   right to discuss his issues with Albany he was admonished for

18   stating that he would call Albany?

19             P.O. BUBB:   That's not true.

20   Do you --

21             THE HEARING OFFICER:   Yes or no.

22             P.O. BUBB:   No, that's not true.

23             MS. SAMPEUR:   Are you the author of this document?

24             P.O. BUBB:   Yes.

25             MS. SAMPEUR:   I know you don't have your glasses, but

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

27

1    it says -- this is part of your current parole supervision.

2              While in the waiting area Mr. Richie --

3         THE HEARING OFFICER:    What are you reading from?

4         MS. SAMPEUR:    It's the second page of this violation

5    packet under current parole supervision.  It's the second

6    paragraph down.  It's about seven sentences up on the last.  It

7    says, "While in."

8         THE HEARING OFFICER:    Okay.

9         MS. SAMPEUR:    "While in the waiting area Mr. Richie

10   shouted he was going to call Albany because he waited for two

11   hours.  Richie was admonished for his threatening behavior."

12        THE HEARING OFFICER:    So you are asking what was meant

13   by the threatening behavior?

14        MS. SAMPEUR:    No, what I'm saying is was he not

15   admonished?

16        P.O. BUBB:    He was not admonished for threatening to

17   call Albany.

18        THE HEARING OFFICER:    Yes or no.  That's all.

19        P.O. BUBB:    No, he wasn't.

20        THE HEARING OFFICER:    You can go into details after

21   she asks questions.

22        MS. SAMPEUR:    Now, when you stated that you were one

23   of the only P.O.s that would take Mr. Richie, what did you mean by

24   that?

25        P.O. BUBB:    Because no one wants to work with a person

Richie, Seth                DIN # 07A5833              NYSID # 05741233R

28

1    who comes in and tells us how to do our job.  When they asked I

2    said, "I have a house, I will see if there is a vacancy."  I

3    called and waited for a return call.  Apparently Mr. Richie --

4              MS. SAMPEUR:    I'm sorry, the response to the initial

5    question was that no one wants to work with someone who tells them

6    how to do their job?

7              P.O. BUBB:    Yes.

8              MS. SAMPEUR:    Okay.

9              Now, when Mr. Richie made these alleged threats to harm

10   himself did you notify the Department of Corrections that

11   Mr. Richie made these threats to harm himself?

12             P.O. BUBB:    When we were in -- yes.

13             MS. SAMPEUR:    Who did you notify?

14             P.O. BUBB:    The person who takes him in.  I didn't get

15   the officer's name.  There is a document that they fill out when

16   they take them in and they asked, "Are you feeling suicidal?"

17   What did Mr. Richie say?  He said, "No."  He answered that but I

18   told corrections what he said. *Not true. She told the C.O. that I was Not suicidal*

19             MS. SAMPEUR:    Do you have any documentation of your

20   conversation with corrections?

21             P.O. BUBB:    No, I don't.

22             MS. SAMPEUR:    Have you been to visit Mr. Richie at all

23   since he has been taken into custody?

24             P.O. BUBB:    No.

25             MS. SAMPEUR:    Did you check to see whether or not

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                    DIN # 07A5833          NYSID # 05741233R

29

1    Mr. Richie was placed in any mental health observation unit on

2    Rikers Island?

3              P.O. BUBB:    No, I did not.

4              THE HEARING OFFICER:    Parole officer, can I see the

5    chrono?

6              P.O. BUBB:    The one that was underlined?

7              THE HEARING OFFICER:    Yes.  I just need to mark it in.

8              P.O. BUBB:    (Handing.)

9              THE HEARING OFFICER:    Thank you.

10             Anything else, Counselor?

11             MS. SAMPEUR:    Yes.

12             Isn't it true that you are, in fact, aware that

13   Mr. Richie has had thoughts of harm -- has expressed thoughts of

14   harming himself on previous occasions?

15             P.O. BUBB:    Yes, he sent me an email stating that.

16             MS. SAMPEUR:    After previous times of you being aware

17   that Mr. Richie has had suicidal or harmful thoughts towards

18   himself did you attempt to have him admitted into a mental health

19   institution?

20             P.O. BUBB:    No, I did not.

21             Mr. Richie is --

22             MS. SAMPEUR:    I'm sorry.

23             Isn't it true that the last time Mr. Richie was admitted

24   into a psychiatric ward of any hospital for his mental health

25   issues it was on his very own accord, he admitted himself?

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

30

1          P.O. BUBB:    I would have to say that you are probably

2    right.  I wasn't supervising him when that happened.

3          MS. SAMPEUR:    Again, you are the author of this

4    document here?

5          P.O. BUBB:    Yes.

6          MS. SAMPEUR:    So then you are, in fact, aware that in

7    February of 2010 he admitted himself into Grace Square Hospital

8    Psychiatric Ward?

9          P.O. BUBB:    Yes, I got that from the chronos prior to

10   me.

11         MS. SAMPEUR:    And then based on this it doesn't appear

12   that there were subsequent admissions into the hospital, correct?

13         P.O. BUBB:    Correct, accept for may 19th. *how it's only 1 day.*

14         MS. SAMPEUR:    Okay.  And all of the subsequent visits

15   to the hospital were also on his own accord, correct?

16         P.O. BUBB:    I would think so.

17         MS. SAMPEUR:    No further questions at this time.

18         THE HEARING OFFICER:    Thank you.

19         Division, you wish to redirect and maybe clarify some of

20   the testimony?

21         P.O. BUBB:    I would like to go back to her inquiry

22   regarding him being admonished for threatening to call Albany.

23         He was not admonished for threatening to call Albany.

24   He was admonished because he stood up in the middle of the waiting

25   area and shouted at me for him sitting out there for two hours and

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                    DIN # 07A5833            NYSID # 05741233R

31

1    he said that he was going to call Albany so the admonishment was

2    for his behavior in the waiting area.  He can't stand up in the

3    middle of about 200 parolees and make threats like that, so that's

4    what he was admonished for.  And he can tell you that I told him

5    he can call Albany everyday of the week, every hour on the hour

6    but he cannot tell me that in the middle of the waiting area.

7    That's what he was admonished for.

8            THE HEARING OFFICER:    Anything else, Division?

9            P.O. BUBB:   And I would like to further support my

10   charge number three because Mr. Richie sent me an email, and I

11   took it as personal threat.  No one else did.  I was very annoyed

12   that no one else did because it was shortly after the shooting

13   that occurred in our office and he basically accused me of abusing

14   my power.  He said that maybe I should just shoot him in the

15   head.  And he said, "You guys really for no real justification

16   push people to the brink," and so when I asked him what the brink

17   was, he said the brink of insanity of ending it.  That's an email

18   sent to me at my office April 23rd.

19           THE HEARING OFFICER:    Show counsel.

20           P.O. BUBB:   (Handing.)

21           And where I was referring to was the bottom paragraph,

22   but feel free to read the entire thing.  He was complaining about

23   the house that he was living in, the house that I found for him,

24   and just the whole thing about being on parole.  Period.  If we

25   don't let Mr. Richie do what he wants to do he is upset about it.

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

                                                                          32

1        THE HEARING OFFICER:    Counsel is reading the email.

2        P.O. BUBB:    Sent to me ~~April 23rd.~~ *visited 5/24/0*

3        THE HEARING OFFICER:    Okay.

4        And did you ever speak to Mr. Richie about the email

5    after you received it?    *Prior to*

6        P.O. BUBB:    Yes, during an office report we went in a

7    conference room so no one else could hear what we were talking    *Bubb, Granum*

8    about.  My supervisor was present and another supervisor was    *Smith, Falcaro*

9    present and we basically went through each paragraph and he

10   explained what he meant.  He was annoyed with me because on parole

11   his name is R-I-C-H-I-E and it's really R I --

12       THE PAROLEE:    R-I-T-C-H-I-E.    *she was making me forget my legal last name.*

13       P.O. BUBB:    He was annoyed because I told him when he

14   signed it I wanted him to sign the parole name as well.  He was

15   just annoyed with anything that I ever asked.  He apologized for

16   that email and then I said, "Okay, you know, all is forgiven, we

17   are going to start over," and he said, "Okay."  He said but he

18   actually didn't write the email.  I said, "Who wrote it?"  He

19   said, "The one with the T," and he laughed about it, you know, but

20   I was very concerned about that he said that I would push him to

21   the brink of insanity and ending it.  *not visited*

22       THE HEARING OFFICER:    And that's why when you saw --

23       P.O. BUBB:    I told my supervisor I don't like when

24   parolees say they are going to kill themselves and he said that

25   twice to me and I have only had him since April 5th.

*law states that when threat of self harm/suicide, mental health evaluation,  5 → jail*

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

                                                                    33

1           THE HEARING OFFICER:    Counsel, have you had an

2   opportunity to look over the document?

3           MS. SAMPEUR:    No, I haven't.  I was trying to listen

4   to this discussion.

5           THE HEARING OFFICER:    It's what's alleged in charge

6   number three since we are not entertaining about the addresses or

7   anything else or the hospital information.  Charges

8           Any objection, Counsel, to the document being entered?

9           MS. SAMPEUR:    I am going to object to this document

10  coming in on the grounds that we don't know exactly who this email

11  name came from.  Individuals can set up email accounts stating

12  anything.

13          THE HEARING OFFICER:    Okay.

14  Can I see the document?

15          MS. SAMPEUR:    (Handing.)

16          THE HEARING OFFICER:    Anything else, Counselor?

17          MS. SAMPEUR:    Furthermore, that document doesn't

18  represent a business record.  That document wasn't produced by the

19  Division of Parole.  This is simply an email that the parole

20  officer is stating that she received.  Whether or not that actual

21  email came from Mr. Richie it's unknown.  Emails can be sent to

22  anyone.  I can set up an email address, Ms. Patterson, in your

23  name.

24          THE HEARING OFFICER:    I get your point.  You are

25  repeating what you had earlier said.

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

34

1            Is there anything else?

2            MS. SAMPEUR:    In addition to there being no actual

3       grounds or basis for that document this doesn't constitute any

4       exception to hearsay, although I'm of the understanding that

5       hearsay is admitted -- is admissible in these administrative

6       proceedings, but if the parole officer is attempting to use this

7       document in support of this particular charge I would ask that it

8       be strictly scrutinized and consideration be given to the fact

9       that this does not meet any particular hearsay exception to be

10      admitted into evidence.

11           THE HEARING OFFICER:    Is that it, Counsel?

12           MS. SAMPEUR:    With respect to the voir diring of that

13      document, yes.

14           THE HEARING OFFICER:    Well, I am going to admit the

15      document in as State's Exhibit-3.

16           This document was verified as testified to earlier by

17      the parole officer when she met with Mr. Richie who indicated that

18      he was sorry for sending the document, so it was an admission.

19           So with that being said, it will be marked as State's

20      Exhibit-3.

21           It's an email from parolee Seth Richie, R-I-T-C-H-I-E.

22      It's dated April 23rd of 2010.

23           (Email was marked as State's Exhibit-3 in evidence;

24      6-3-10.)

25           THE HEARING OFFICER:    Anything else, Division?

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                    DIN # 07A5833            NYSID # 05741233R

                                                                    35

1              P.O. BUBB:    Nothing.

2              MS. SAMPEUR:    If I may re-cross at this time.

3              THE HEARING OFFICER:    In regard to what?

4              MS. SAMPEUR:    Well, in regard to her testimony on

5    redirect.

6              THE HEARING OFFICER:    Okay.

7              MS. SAMPEUR:    When you stated that he wasn't

8    admonished for making a threat, you consider Mr. Richie

9    acknowledging his right to call Albany to be a threat?

10             P.O. BUBB:    No.  You are twisting my words.

11             MS. SAMPEUR:    I'm stating because you stated --

12             THE HEARING OFFICER:    Okay, let's be clear.  We are

13   not going back and forth with this.  What I heard was that the

14   parole officer testified that the behavior that was threatening

15   was standing in the waiting area with a number of parolees making

16   statements.

17             Is there anything else?

18             MS. SAMPEUR:    I'm sorry, because what I had heard was

19   that he wasn't --

20             THE HEARING OFFICER:    I know what you heard, Counsel,

21   but I'm telling you what was stated for the record.

22             Is there anything else?

23             MS. SAMPEUR:    The Division of Parole, particularly

24   individuals in your office, you would consider them to be fed up

25   with Mr. Richie, correct?

Richie, Seth                    DIN # 07A5833            NYSID # 05741233R

36

1           THE HEARING OFFICER:    Counsel --

2           MS. SAMPEUR:    I will rephrase that question.

3           THE HEARING OFFICER:    That was not on redirect.  That

4       was not.

5           Anything else, Counsel?

6           MS. SAMPEUR:    Yes.

7           Do you have chronos referring to the conference that you

8       had with someone, I'm not entirely sure who you stated you

9       discussed it with?

10          THE HEARING OFFICER:    In regard to the email?

11          MS. SAMPEUR:    Yes.

12          THE HEARING OFFICER:    Okay, let's be clear.

13          P.O. BUBB:    No.

14          THE HEARING OFFICER:    The answer is no?

15          P.O. BUBB:    The answer is no.

16          THE HEARING OFFICER:    Anything else, Counsel?

17          MS. SAMPEUR:    No further questions.

18          THE HEARING OFFICER:    Division, you rest?

19          P.O. BUBB:    Yes.

20          THE HEARING OFFICER:    Counsel, is your client going to

21      be testifying?

22          MS. SAMPEUR:    No.

23          THE HEARING OFFICER:    Closing statements.

24          P.O. BUBB:    I would just like to say that Mr. Richie's

25      behavior was a violation in an important respect because

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                    DIN # 07A5833         NYSID # 05741233R

37

1   considering what he is on parole for, the threats to harm himself,

2   I would not be doing my job if I do not take steps to remove him

3   from the community.

4          Of course I can't do that without conferencing the

5   matter with my superiors, and after doing so the decision was made

6   to do just that.

7          THE HEARING OFFICER:    Thank you.

8          Counsel.

9          MS. SAMPEUR:    Mr. Richie has been on parole for over a

10  year now.  He was released in March 24, 2009 as stated in the

11  violation papers.  He's been doing parole successfully without any

12  problems for the past year.  He does have significant mental

13  health issues, as Parole Officer Bubb has stated that she was, in

14  fact, aware of his significant mental health issues.

15         We also have an individual here who has made numerous

16  complaints against the Division of Parole to the point that no

17  other parole officer, according to Parole Officer Bubb's

18  testimony, no other parole officer wanted to take him under their

19  supervision.  In fact, it states that he has made several

20  complaints, and Ms. Bubb testified to that fact, and that he would

21  stand up to his right to do so to make complaints to Albany in the

22  parole office amongst other parolees.  Mr. Bubb appears to have

23  presented a problem to the Division of Parole in the sense that he

24  is an active parolee.  He is not being charged with missing office

25  reports.  In fact, the paperwork states that he made all of his

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

1   office reports, he maintained office reports, as it says here,

2   reported as directed.

3         So this situation begs the question as to whether or not

4   this parole officer actually thought this to be a serious threat

5   or if this was just -- in this instance individuals were just fed

6   up with Mr. Richie and wanted to add an additional charge.

7         Parole Officer Bubb stated that she was concerned after

8   the email that's alleged to have been sent by Mr. Richie on April

9   23rd, 2010 and she also stated that no one else in the Division of

10  Parole took it seriously, took it as a threat.  So much so in

11  terms the manner  in how much of a threat she perceived it to be,

12  that conference wasn't even noted in a chronological note which

13  Parole Officer Bubb stated that she felt that that was, in fact, a

14  threat, that she felt worried by that but made absolutely no

15  chronological notation detailing any discussion that she's had

16  with anyone regarding this alleged threat of Mr. Richie towards

17  himself.

18        In addition, she also stated in the time under her

19  supervision she's made no efforts to attempt to get him into any

20  -- no efforts to actually have him admitted into any mental

21  health hospitals.

22        And, in fact, the last time which he was admitted into a

23  mental health hospital Mr. Richie admitted himself.  Mr. Richie

24  has been the one here attempting to maintain and deal with his own

25  mental health issues.

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

39

```
1          What I feel right now is even if we look at charge
2     number 8, and if we are to believe that Mr. Richie stated he would
3     hang himself when these cuffs are removed, you have Mr. Richie now
4     being penalized for having mental health issues.  Officer Bubb is
5     aware of the fact that he has these issues.  She is aware of the
6     fact that he was abused as a child and these are --
7          THE HEARING OFFICER:    I haven't heard anything of that
8     nature.
9          MS. SAMPEUR:    I did ask Officer Bubb if she was aware
10    of the reason why he has significant mental health issues,
11    specifically that he was abused as a child and she answered yes.
12         THE HEARING OFFICER:    Okay.
13         MS. SAMPEUR:    If the Division of Parole is actively
14    seeking to help people I wouldn't consider violating someone,
15    putting someone back in jail as opposed to putting them in a
16    mental health hospital, somewhere where they can get active
17    treatment outside of Rikers island.
18         Are we to believe that this was Parole's intention to be
19    helpful to Mr. Richie, to be concerned for Mr. Richie.
20         Hearing Officer, to violate and to find probable cause
21    on this particular charge would be penalizing Mr. Richie for
22    having significant mental health issues.
23         Again, when the parole officer states previous threats
24    to himself, previous concerns, those concerns weren't even worth
25    noting in chronological reports, and she made no attempts to help
```

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

40

1    him seek outside help or outside assistance or any sort of mental

2    health treatment.

3              If the concern is that Mr. Richie is a threat to

4    society -- now, I'm confused as to him being a threat to himself

5    equals him being a threat to all of society.  If the concern is

6    that he doesn't need to be on the streets with individuals in

7    society because he may harm himself, why not attempt to put

8    Mr. Richie in a place where he can actually get legitimate

9    treatment, legitimate help.  Here none of that was done.  All we

10   have is the parole officer suggesting that things alleged to have

11   been said are threats to himself, yet no action was actually taken

12   to secure that Mr. Richie would be actually receiving him and, in

13   fact, she didn't even document any conversation that she may or

14   may not have had with individuals --

15             THE HEARING OFFICER:   I heard that already, Counsel.

16             MS. SAMPEUR:    What I am saying is individuals who took

17   Mr. Richie to Rikers Island.

18             In addition, there was no follow-up as to whether or not

19   Mr. Richie was actually receiving any cautionary or monitoring or

20   cautionary activities while here at Rikers Island.  The parole

21   officer stated that she never checked to see whether or not he was

22   actually admitted into mental observation.  She never came to

23   visit him or see what his status was here on Rikers Island.  I

24   mean she stated that she was legitimately concerned that he may

25   harm himself but no action was taken for any follow-up as to

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

41

1    whether or not Mr. Richie may or may not have hurt himself here at

2    Rikers Island, specifically whether or not he was admitted into

3    mental observation.

4              THE HEARING OFFICER:    Anything else.

5              MS. SAMPEUR:    So in terms of whether or not this

6    allegation constitutes a violation in an important respect, you

7    have a man on parole for a year maintaining his own mental health

8    issues, being the one to supervise himself with respect to what it

9    is he is feeling, the necessity to seek mental health treatment.

10   He has admitted himself to the hospital on a number of occasions.

11   Documented here in the violation packet none of which times he was

12   obligated to go by the Division of Parole. He has been on parole

13   for the past year attempting to do the right thing and to violate

14   him for having a mental health issue --

15             THE HEARING OFFICER:    Is there anything else, Counsel,

16   because I do believe that point has been made.

17             MS. SAMPEUR:   I just want to stress how egregious it

18   would be to violate someone for their mental health issues and

19   today we would be asking for a warrant lift and a finding of no

20   probable cause on charge number three.

21             THE HEARING OFFICER:    Thank you.

22             Well, I have taken into consideration everything that

23   has been said during this lengthy hearing. We have basically gone

24   through all three charges. I will let it be noted as far as this

25   record that due to the typographical errors in charge number one

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

42

1    the Division of Parole chose note to proceed with that charged so

2    there is a reserve decision on that because I can't make a

3    decision with them not going forward.

4              In regard to charge number two, the charge was read and

5    a plea entered of not guilty and that charge due to information

6    and testimony that was offered by the parole officer I have to

7    reserve on that decision as to whether or not probable cause be

8    found because I was not given enough information based on the

9    testimony of this parole officer as to the untruthfulness of the

10   inquiries about the hospitalization.

11             Now, in regard to charge number three, I have heard

12   testimony from this parole officer.  I have also the chronological

13   reports which were prepared contemporaneously to the actions and

14   the behaviors occurring as testified to by the parole officer on

15   May 24th.  I have also admitted that as well as the email that the

16   parole officer has testified to under oath that she continued even

17   after receiving this email to supervise Mr. Richie.  She has

18   testified that there have been some issues and concerns about the

19   supervision of Mr. Richie through various staff members of the

20   Division of Parole, however, what I'm hearing from this parole

21   officer was that she was willing in spite of the issues and

22   concerns that other officers might have had in supervising

23   Mr. Richie she felt that she had a placement available and that

24   she was willing to take the extra effort to work with Mr. Richie.

25             I do believe that the testimony is credible that this

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

43

1     parole officer felt that the threat that Mr. Richie through his

2     statements of wanting to harm himself were real.  I don't believe

3     that by this parole officer determining through her conferencing

4     with her supervisors that the violation be prepared was a

5     punishment or punitive against Mr. Richie.

6           I don't feel also that the certificate of release to

7     parole supervision which sites conditions of release, specifically

8     number 8, in that any parolee or anyone under parole supervision,

9     in this particular certificate I'm reading from what was signed by

10    Mr. Richie on March 19, 2007, indicating that his behavior would

11    not threaten the well-being of himself, and I don't believe that

12    when the certificate of release was drafted that the authors were

13    thinking of punishing anyone who had these thoughts of suicide or

14    felt that this was a punishment.  This is indeed the Division of

15    Parole from what I see with this parole officer, trying to find

16    suitable or favorable programming in which Mr. Richie could avail

17    himself.  He is under parole supervision until 2011 for a serious

18    offense and this parole officer has presented the case whereby I

19    find probable cause to the charge number three and there is a

20    final hearing that's going to be now scheduled for Mr. Richie on

21    June the 15th, and it will take place here at the Rikers Island

22    Judicial Center.

23           Good luck, Mr. Richie, at your final.

24           (Hearing concluded)

25

Richie, Seth                    DIN # 07A5833              NYSID # 05741233R

44

1

2

3                              CERTIFICATION

4

5

6

7                 I, DEBRA A. IADEVAIO, Court Reporter and Notary

8      Public in and for the State of New York, do hereby certify that I

9      attended the foregoing proceedings, took stenographic notes of the

10     same, that the foregoing consisting of 43 pages, is a true and

11     correct copy of same and the whole thereof.

12

13     Dated: June 6th, 2010

14

15

16

17

18     --Debra Iadevaio--------------

19              DEBRA A. IADEVAIO, Court Reporter

20

21

22

23

24

25

                         PRECISE COURT REPORTING
              (516) 747-9393 (718) 343-7227 (212) 581-2570